UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Vincent Bray,                                          File No. 24-cv-119 (ECT/JFD)

        Plaintiff,

v.                                                         **OPINION AND ORDER**

Symetra Life Insurance Company,

        Defendant.

---

Mark Klotzbuecher and Zachary Schmoll, Fields Law Firm, Minnetonka, MN, for Plaintiff Vincent Bray.

Terrance J. Wagener and Molly Renee Hamilton Cawley, Messerli & Kramer P.A., Minneapolis, MN, for Defendant Symetra Life Insurance Company.

---

In this ERISA lawsuit, Plaintiff Vincent Bray seeks to recover long-term disability benefits under an employee welfare benefit plan (the "Plan") sponsored by his former employer, WP Holding, Inc., and insured and administered by Defendant Symetra Life Insurance Company. On July 16, 2022, after paying Mr. Bray benefits for more than four years, Symetra stopped. At first, Symetra based its decision to terminate benefits on Mr. Bray's failure to provide required medical information. After Mr. Bray challenged this decision through the Plan's administrative procedures, Symetra decided the termination of Mr. Bray's benefits was appropriate for a different reason—that Mr. Bray could work in a "gainful occupation." Mr. Bray challenges Symetra's final appeal decision.

Mr. Bray and Symetra have filed competing motions.  Mr. Bray seeks the entry of judgment on the administrative record pursuant to Federal Rules of Civil Procedure 39(b) and 52(a)(1).  Symetra seeks the entry of summary judgment pursuant to Rule 56.  It agreed, however, that if fact disputes prevent summary judgment, its motion should be recast and adjudicated as one seeking the entry of judgment on the administrative record.

The result is a mixed bag that reflects the claim's unusual procedural history and the evidence in the administrative record.  (1) Symetra applied the wrong policy provision to justify its decision not to award Mr. Bray benefits between July 16, 2022, and March 16, 2023.  It judged Mr. Bray's claim against an "any occupation" standard when it should have judged the claim against the more Mr. Bray-friendly "own occupation" standard.  This error means Mr. Bray will be awarded benefits for this eight-month period.  (2) After that, the record establishes that Mr. Bray is not entitled to benefits.  This is so for procedural and evidentiary reasons.  Procedurally, Mr. Bray had a full and fair opportunity to show that he was entitled to benefits after March 16, 2023, but he largely passed on that chance. Regardless, the record evidence establishes that Mr. Bray is not entitled to benefits after that date.

I[1]

*Mr. Bray worked as a "box stacker" for Turkey Valley Farms, a WP Holding affiliate, beginning in 2016.*  AR 6703, 6807.  Among other duties, Mr. Bray assembled

---

[1]    The administrative record runs 6,840 pages in length.  It was filed in Bates-numbered order at ECF Nos. 22-1 to 22-14.  Citations in this Opinion will refer to the administrative record by the short form "AR" and to specific pages by their assigned Bates numbers, located in the bottom-right corner of each page.

and stacked boxes, ensured that "stacked boxes [we]re secured," and selected the correct box for the associated pallet on which the box was to be stacked. AR 3364. The job was physically demanding. Box stackers were required to repetitively lift more than fifty pounds "over the head and below the waist" and to occasionally lift loads weighing up to seventy-five pounds. AR 3364, 6105.

On May 2, 2016, Mr. Bray suffered an on-the-job left-shoulder injury. AR 3630, 4866, 5474. Following the injury, Mr. Bray was examined by Charles Dike, M.D. AR 5444, 5455, 5474. An MRI showed a supraspinatus[2] tear, biceps tendinitis, and mild acromioclavicular[3] joint arthritis and inflammation. AR 5486. Dr. Dike referred Mr. Bray to an orthopedic surgeon. AR 5497.

On July 22, 2016, Mr. Bray was examined by James Donohue, M.D., an orthopedic surgeon. AR 5508. Dr. Donohue diagnosed Mr. Bray with a complete tear of his left rotator cuff and acromioclavicular arthritis. AR 5508–09. Dr. Donohue administered a subacromial[4] injection and prescribed physical therapy. AR 5509.

---

[2]    The supraspinatus muscle is an "intrinsic (scapulohumeral) [muscle] of [the] shoulder joint, the tendon of which contributes to the rotator cuff." *Supraspinatus (m.)*, *Stedman's Medical Dictionary* (28th ed. 2006).

[3]    "Acromioclavicular" means "[r]elating to the acromion and clavicle." *Acromioclavicular*, *Stedman's Medical Dictionary* (28th ed. 2006). The "acromion" is "[t]he lateral extension of the spine of the scapula that projects as a broad flattened process overhanging the glenoid fossa; it articulates with the clavicle and gives attachment to part of the deltoid muscles. Its lateral border is a palpable landmark ('the point of the shoulder')." *Acromion*, *Stedman's Medical Dictionary* (28th ed. 2006).

[4]    "Subacromial" means "[b]eneath the acromion process." *Subacromial*, *Stedman's Medical Dictionary* (28th ed. 2006).

*Because the injection and physical therapy did not relieve his symptoms, Mr. Bray opted for surgery.* AR 5533. Even with the injection and physical therapy, Mr. Bray continued to have "significant pain" in his left shoulder, rating it "as a level 10/10 with activity." AR 5532. And his pain spread. In addition to pain in the shoulder joint, Mr. Bray "develop[ed] pain radiating up into his trapezius and neck region as well as a heavy feeling radiating down into his forearm and hand on the left." *Id.*

*On October 25, 2016, Mr. Bray underwent an open acromioplasty[5] and an open rotator cuff repair to his left shoulder.* AR 5256. At a follow-up appointment on November 10, Mr. Bray reported that he was continuing to experience significant pain in his left shoulder. AR 5580. Dr. Donohue recommended Mr. Bray participate in physical therapy but noted that Mr. Bray would not likely reach maximum medical improvement until a year after the surgery. AR 5581, 5583.

*Mr. Bray participated in physical therapy from November 2016 through February 2017.* AR 5658, 5223–32, 6081–6103. Though Mr. Bray showed some improvement initially, AR 5622, Dr. Donohue recommended discontinuing physical therapy early on, *see* AR 5658–59. Dr. Donohue noted that Mr. Bray continued to experience significant pain, rating it "a level 50 out of 10 at times." AR 5658–59. And he diagnosed Mr. Bray

---

[5] An "acromioplasty" is "[a] surgical reshaping of the acromion, frequently performed to remedy compression of the supraspinatus portion of the rotator cuff of the shoulder joint between the acromion and the greater tubercle of the humerus." *Acromioplasty*, *Stedman's Medical Dictionary* (28th ed. 2006).

with moderate adhesive capsulitis.[6]  AR 5604.  After Dr. Donohue tried unsuccessfully to refer Mr. Bray to a shoulder specialist for further care, AR 5659, 5670, 5694, Mr. Bray resumed physical therapy, AR 5223–5232, 5694.  At an appointment with Dr. Donohue on February 17, 2017, however, Mr. Bray rated his shoulder pain level as a 10/10 and explained he was experiencing numbness in his left hand.  AR 5694.  Dr. Donohue noted that Mr. Bray was experiencing "progressive increase in pain and decrease in function."  AR 5695.  At a subsequent appointment with Dr. Donohue on March 1, 2017, Mr. Bray's pain level remained high, and Dr. Donohue noted that Mr. Bray did "not appear to be improving subjectively or objectively with physical therapy over the last month."  AR 5724.  Dr. Donohue believed he had exhausted all treatment options and again recommended that Mr. Bray be examined by a shoulder specialist.  AR 5724.

*On April 4, 2017, Mr. Bray was examined by shoulder specialist Keith Baumgarten, M.D.*  AR 4001, 5207.  Dr. Baumgarten noted that Mr. Bray had "very little active range of motion" in his left shoulder.  AR 5207.  Dr. Baumgarten also concluded that radiographs of Mr. Bray's cervical spine showed spondylosis.[7]  AR 5207.  He wrote that Mr. Bray had "significant difficulty with the cervical spine," and opined that Mr. Bray may have

---

[6]    "Adhesive capsulitis" (also known as "frozen shoulder") is "a condition in which joint motion becomes restricted because of inflammatory thickening of the capsule; a common cause of shoulder stiffness."  *Adhesive capsulitis*, *Stedman's Medical Dictionary* (28th ed. 2006).

[7]    "Spondylosis" is "[a]nkylosis of the vertebra."  *Spondylosis*, *Stedman's Medical Dictionary* (28th ed. 2006).  "Ankylosis" is "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint; fusion."  *Ankylosis*, *Stedman's Medical Dictionary* (28th ed. 2006).

radiculopathy[8] that "contribut[ed] to his current pattern." AR 5207. Dr. Baumgarten referred Mr. Bray to James Brunz, M.D., for treatment of his cervical spine. AR 5158–59. A subsequent MRI showed that Mr. Bray was suffering from a herniated disk. AR 5158.

*From May 2017 to August 2017, Mr. Bray received treatment for his cervical spine.* *See* AR 5092, AR 5099–5100, 5107–08, 5124–27, 5158–60. Mr. Bray received a cervical epidural injection that had little effect. AR 5107, 5124–27. Mr. Bray's treating physicians seemed to have different opinions regarding whether Mr. Bray's spinal problems contributed to his left shoulder pain. *Compare* AR 5080 (noting that "most of [Mr. Bray's] shoulder pain [was] actually coming from intrinsically within his shoulder"), *with* AR 5065 (noting that Mr. Bray's cervical-spine problems contributed to his shoulder pain to some extent).

*By August 2017, Mr. Bray had pain in his right shoulder, though it was less intense than the pain in his left shoulder.* AR 4968, 5092, 5099; *see also* 4928–29. On August 17, 2017, he received a subacromial-space injection in both shoulders. AR 5117. In November 2017, an MRI of Mr. Bray's right shoulder revealed a partial tendon tear, a small cyst, moderate degenerative changes, and a possible torn labrum. AR 5037, 5040. Mr. Bray participated in physical therapy for his right shoulder. AR 4928, 4968–71.

---

[8]    "Radiculopathy" is a "[d]isorder of the spinal nerve roots." *Radiculopathy*, *Stedman's Medical Dictionary* (28th ed. 2006).

*Mr. Bray applied for long-term disability benefits.*  AR 3239.  To receive benefits under the Plan, Mr. Bray had to show that, following exhaustion of an eligibility period,[9] he remained disabled from his "regular occupation."  AR 3449.  The Plan defined "disabled" as a "sickness or injury" that "prevents you from performing with reasonable continuity the material and substantial duties of your regular occupation . . . and, as a result, the income you are able to earn is less than or equal to 80% of your pre-disability earnings." AR 3449.[10]  Important to Mr. Bray's claim in this case, this definition of "disabled" applied during a beneficiary's first sixty months of receiving long-term disability benefits.  AR 3449.  After that, the Plan defines "disabled" by reference to an "any gainful occupation" standard—*i.e.*, a sickness or injury that "prevents you from performing with reasonable

---

[9]    The eligibility (or "elimination") period is "a period of continuous days" a participant must remain disabled before becoming eligible to receive benefits.  AR at 3451. The period runs "[t]he later of: 90 days after the date disability begins or the date accumulated sick leave ends or the date salary continuation ends or the date short term disability payments to you end."  AR 3436.

[10]    The Plan defined several terms appearing in its definition of "disabled."  These definitions don't seem to matter to Mr. Bray's claim.  Regardless, for the sake of completeness, they are provided here.  The Plan defined "regular occupation" as "the occupation, as it is performed nationally, that you are routinely performing when your disability begins.  Your regular occupation does not mean the job you are performing for a specific employer or at a specific location."  AR 3450.  A "reasonable employment option" is "an employment position with the employer for which you are able to perform the material and substantial duties given your education, training and experience.  If you have been working in a reasonable employment option for 6 months or more, the reasonable employment option will then be considered your regular occupation."  AR 3450.  "Material and substantial duties" refers to duties that "are normally required for performance of the occupation" and "cannot be reasonably omitted or changed."  AR 3449.  "Sickness" is "an illness or disease," and "includes an injury which occurs before you are insured."  AR 3450.  "Injury" is "a bodily injury that occurs while you are insured and is the direct result of an accident and not related to any other cause."  AR 3450.

continuity the material and substantial duties of *any gainful occupation* and, as a result, the income you are able to earn is less than or equal to 60% of your pre-disability earnings." AR 3449 (emphasis added).  The Plan defined "gainful occupation" as "any occupation that your past training, education, or experience would allow you to perform or for which you can be trained."  AR 3450.  Symetra determined that Mr. Bray was disabled, approved his claim, and began paying benefits to Mr. Bray on March 17, 2018, after the elimination period had expired.  *See* AR 339, 800, 6836.

*Mr. Bray's condition did not improve, and he underwent a second left-shoulder surgery.*  Due to continued left-shoulder pain, Mr. Bray underwent a second surgery on December 15, 2017.  AR 4929–31.  Specifically, Mr. Bray underwent a "[l]eft shoulder arthroscopic lysis of adhesions, subacromial space,"[11] "[r]evision subacromial decompression," "AC joint resection," and "[d]ebridement of superior labrum."[12]  AR 4930.  His post-operative diagnoses included left shoulder adhesions, acromioclavicular joint arthrosis, and a superior labral tear.  *Id.*

*Mr. Bray continued to experience pain after his second surgery.*  *See* AR 4926, 4952, 5832–33, 4890.  Mr. Bray engaged in physical therapy sessions during the year

---

[11]    "Lysis of adhesions is a surgical procedure performed to remove or break down internal scar tissue (adhesions) that has formed between organs or tissues, often as a result of previous surgery, infection, or inflammation."  *Lysis of Adhesions*, *Yale Medicine*, https://www.yalemedicine.org/clinical-keywords/lysis-of-adhesions (last visited May 27, 2025).

[12]    "Debridement" is the "[e]xcision of devitalized tissue and foreign matter from a wound."  *Debridement*, *Stedman's Medical Dictionary* (28th ed. 2006).

following his second surgery, and though he "improved overall," he continued to deal with pain and a loss of strength.  AR 4913–17 (June 13, 2018); AR 2684–87 (July 27, 2018); AR 4972–75 (March 16, 2018);[13] AR 3892–93 (April 11, 2018); AR 4884–87 (September 5, 2018); AR 4890; *see also* AR 3566 ("[Mr. Bray] has seen some improvements but he has continued to have difficulty with pain and function.").  In addition to physical therapy, Mr. Bray received two left subacromial injections in his left shoulder, one on February 8, 2018, AR 4926, and a second on September 6, 2018, AR 4890, but he continued to experience pain, AR 4866, 4873.  At times, Mr. Bray reported pain in areas beyond his shoulder.  *See* AR 5832–33 (noting headaches "likely as a result of the shoulder injury"); AR 4864 (diagram showing numbness, aching, pins and needles, and burning sensation outside of shoulder area); AR 4866–67 (describing pain beginning on the left side of his neck and going down into his trapezius, perhaps into his left scapula, and into his lateral shoulder along the deltoid, as well as a numbness and tingling in his hands, some pain in his bilateral thumbs and medial forearm hat goes into his ring and pinky fingers, more so on the left).

*As of December 2018, Dr. Baumgarten believed further surgery would not relieve Mr. Bray's left shoulder pain; he recommended focusing on treating Mr. Bray's cervical spine.*  On December 3, 2018, Dr. Baumgarten opined that "[i]t does not appear it is likely that further shoulder treatments, i.e. physical therapy, repeat injections and third surgery is

---

[13]    These physical therapy notes list Mr. Bray's diagnosis as "pain in right shoulder." AR 4972, 4976.  However, the substance of the reports reveals the therapy was focused on Mr. Bray's left shoulder.  *See, e.g.*, AR 4973 (showing treatment included "[s]upine PROM of *left* shoulder . . . ." (emphasis added)).

reliable in relieving" Mr. Bray's symptoms. AR 4873. Around that time, an MRI revealed several problems with Mr. Bray's cervical spine, including spondylosis with straightening of the cervical lordosis, "2-3mm broad-based left-sided disc protrusions at C5-6 and C4-5 with left ventral cord flattening at each level[,] 2 mm broad-based right paracentral disc protrusion at C6-7 with ventral cord abutment[,] [c]hronic foraminal stenosis, severe bilaterally at C4-5 and moderate bilaterally at C5-6," and showed that in comparison with an earlier MRI from 2017, "foraminal stenosis has progressed on the right at C4-5," but "[d]egenerative changes are otherwise similar."[14] AR 4852. On April 8, 2019, Mr. Bray underwent a nerve root block to address pain arising from his cervical spine. AR 4855–56, 4837–38. The block seems not to have brought Mr. Bray relief, AR 4833, and the focus then returned to his left shoulder, *see* AR 4831–32.

*Mr. Bray underwent a third surgery on his left shoulder.* AR 5333–36. Over several appointments in May 2019, Erik Peterson, M.D., administered diagnostic injections intended to identify the source of pain within Mr. Bray's shoulder. AR 4831–32 (May 2, 2019); 4826–27 (May 14, 2019); 4821–22 (May 21, 2019). Dr. Peterson concluded that Mr. Bray's "biceps may be a hidden pain generator"; he diagnosed Mr. Bray with left shoulder biceps tenosynovitis[15] and thought that surgery might address the issue. AR

---

[14]    "Foraminal stenosis" is "narrowing that happens in certain places around the nerves that come out of [the] spinal cord." *Foraminal Stenosis*, *Cleveland Clinic*, https://my.clevelandclinic.org/health/diseases/24856-foraminal-stenosis (last visited May 27, 2025).

[15]    "Tenosynovitis" is "[i]nflammation of a tendon and its enveloping sheath." *Tenosynovitis*, *Stedman's Medical Dictionary* (28th ed. 2006).

4821–22.  On August 22, 2019, Dr. Peterson performed a "[l]eft shoulder arthroscopic biceps tenodesis,"[16] "[a]rthroscopic rotator cuff repair," and "[a]rthroscopic subacromial decompression including extensive lysis of adhesions, postop in nature from the subacromial and subdeltoid space."  AR 5333.  Post-operatively, Dr. Peterson diagnosed Mr. Bray with left shoulder type 2 superior labrum anterior and posterior ("SLAP") tear,[17] "[p]artial tear of medial biceps sling with instability and severe biceps tenosynovitis," "[l]ongitudinal partial rotator cuff tear in the area that was previously repaired," "[s]evere subacromial and subdeltoid postop adhesions," and "[s]ubacromial impingement syndrome."[18]  AR 5333.

   *Mr. Bray continued to experience shoulder pain after his third procedure.*  AR 4148. After this third surgery, Mr. Bray resumed physical therapy, AR 5317–29 (September 2019 to November 2019); AR 4103 (December 2019); AR 4117–35 (December 2019 to February 2020), and received more subacromial injections, AR 5316 (November 7, 2019);

---

[16]    "Biceps tenodesis" involves "detaching [the] biceps tendon from [the] labrum and moving the tendon to [the] upper arm bone (humerus)."  *Biceps Tenodesis*, *Cleveland Clinic*, https://my.clevelandclinic.org/health/treatments/21926-biceps-tenodesis (last visited May 27, 2025).

[17]    "In Type 2 [SLAP] tears, the labrum and bicep tendon are torn from the shoulder socket."  *SLAP Tear*, *Cleveland Clinic*, https://my.clevelandclinic.org/health/diseases/21717-slap-tear (last visited May 27, 2025).

[18]    "Subacromial impingement syndrome" is "the inflammation and irritation of [the] rotator cuff tendons."  *Subacromial Impingement Syndrome*, *Kan. City Bone & Joint*, https://www.kcbj.com/subacromial-impingement-syndrome-orthopedic-musculoskeletal-care-overland-park-kansas-city (last visited May 27, 2025).  "This occurs when the tendons rub against the outer end of the shoulder blade (the acromion) while passing through the subacromial space during shoulder movement."  *Id.*

11

AR 4302 (April 17, 2020); AR 4292 (August 24, 2020), but continued to experience shoulder pain and limited range of motion, AR 4148, 4279, 4292, 4312, 4288–89.

*On November 20, 2020, Mr. Bray underwent a nerve block to determine whether he might be a candidate for radiofrequency ablation.*[19]  AR 4289, 4554.  The nerve block procedure indicated Mr. Bray would be a candidate for radiofrequency ablation.  AR 4554. However, apparently due to difficulties obtaining workers' compensation coverage for the procedure, it was not performed.  *See* AR 2288, 4554.

*From the date he was injured, Mr. Bray consistently received restrictions limiting him to either "no work" or sedentary-level work.*[20]  *See* AR 5451–52 (May 16, 2016: No lifting with left arm over 10 pounds); AR 5463 (May 25, 2016: No lifting with left arm over 10 pounds); AR 5481 (June 3, 2016: No lifting over 10 pounds); AR 5494 (July 1, 2016: No lifting over 10 pounds); AR 5517 (July 22, 2016: No lifting over 10 pounds); AR 5528 (September 14, 2016: Right-handed duty only); AR 5541 (October 12, 2016: Right-handed duty only, off work for eight to twelve weeks post-surgery); AR 5556 (October 18, 2016: Right-handed duty only); AR 5587–88 (November 10, 2016: Off work); AR 5611

---

[19]    "Radiofrequency ablation" is a procedure that "uses radio waves to create a current that heats a small area of nerve tissue," thereby "destroy[ing] that area of the nerve, stopping it from sending pain signals to [the] brain." *Radiofrequency Ablation for Pain Management*, *Cleveland Clinic*, https://my.clevelandclinic.org/health/treatments/17411-radiofrequency-ablation (last visited May 27, 2025).

[20]    A Social Security regulation defines "sedentary work" as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a).  It seems reasonable to conclude that Mr. Bray's health-care providers had this definition (or something very close to it) in mind when they limited him to sedentary work.

(November 30, 2016: Off work); AR 5628–29 (December 16, 2016: Off work); AR 5666 (January 6, 2017: Off work); AR 5702 (February 17, 2017: Off work); AR 5730–31 (March 1, 2017: Off work); AR 5201 (April 4, 2017: Right arm work only); AR 5181 (April 18, 2017: Off work); AR 5153 (May 16, 2017: No lifting over 5 pounds with left arm); AR 5111 (August 17, 2017: Off work if needed, or no lifting over 5 pounds with left arm); AR 5093 (August 18, 2017: Off work); AR 5053 (September 15, 2017: No lifting over 2 pounds); AR 4941 (November 21, 2017: Off work); AR 4940, 5403 (December 15, 2017: Off work); AR 4939 (January 2, 2018: Off work); AR 4938 (February 8, 2018: Off work); AR 4937 (March 22, 2018: No lifting over 5 pounds); AR 4956 (November 21, 2017 to March 22, 2018: No work); AR 4936 (April 26, 2018: No lifting over 5 pounds with left arm); AR 4904 (May 8, 2018: No lifting over 10 pounds); AR 4903 (August 2, 2018: No lifting over 10 pounds); AR 4889 (September 6, 2018: No lifting over 10 pounds); AR 4872 (December 3, 2018: No lifting over 10 pounds); AR 4847 (February 21, 2019: Off work); AR 5352 (August 22, 2019: Off work); AR 5330 (September 5, 2019: Off work); AR 5315 (November 7, 2019: Off work); AR 4147 (December 20, 2019: No use of left arm); AR 4140 (February 11, 2020: No use of left arm); AR 4304 (April 17, 2020: No use of left arm); AR 4558–59 (February 5, 2021: Off work).[21]

---

[21]    There is one exception to this pattern.  Dr. Wingate allowed Mr. Bray to return to work on September 13, 2017, without limitations.  AR 5070.  However, this appears to be because Dr. Wingate believed the condition of Mr. Bray's *cervical spine* did not warrant work restrictions; Dr. Wingate appears not to have addressed Mr. Bray's left shoulder.  See AR 5070 (noting a diagnosis of "cervical spine pain"); *see also* AR 5079–80 ("At this time, I do think that most of his shoulder pain is actually coming from intrinsically within his shoulder.").  Just one day later, on September 14, Dr. Baumgarten restricted Mr. Bray to lifting not more than two pounds.  AR 5053.

*Independent medical reviewers generally agreed with the work restrictions imposed by Mr. Bray's treating physicians.* An orthopedic surgeon retained in connection with Mr. Bray's separate workers' compensation claim, Loren Vorlicky, M.D., reviewed Mr. Bray's medical history, examined Mr. Bray, and issued a report dated April 27, 2018. AR 3630. Dr. Vorlicky found "it would be reasonable for Mr. Bray to have a 10-pound lifting restriction for his left shoulder," though he expected the restriction might not be permanent. AR 3641. A registered nurse hired by Symetra, Mark Nichols, reviewed Mr. Bray's medical records. AR 3161. In a report dated December 9, 2020, he agreed that Mr. Bray's medical history supported a ten-pound lifting restriction. AR 3170. Mr. Nichols noted that, although Mr. Bray's condition had improved during his treatment, "there still remained ongoing symptoms of the left shoulder which included decreased range of motion, pain, and decreased strength." AR 3170. Regarding Mr. Bray's likelihood of improvement, Mr. Nichols noted that given his extensive treatment history, "[t]he likelihood of any significant improvement would be guarded." AR 3170.

*Mr. Bray was jailed from early May 2021 until early March 2023.* AR 853. In his principal brief, Mr. Bray explains that he was "incarcerated following a parole violation in Bates County, South Carolina from May 1, 2021, through March 1, 2023." ECF No. 14 at 6. The administrative record includes little documentation regarding medical care Mr. Bray might have received during this period. *See* AR 4744–58. Regardless, no evidence shows or permits the inference that Mr. Bray's physical condition changed materially.

*Symetra terminated Mr. Bray's benefits during his incarceration.* To receive benefits, the Plan required Mr. Bray to be "under the regular care of a doctor" for his

14

disability-causing conditions and, at Symetra's request, to provide "proof of continuing disability." AR 3452, 3472. The Plan warned that benefits could be "temporarily suspend[ed]" if requested information was not submitted. AR 3472. In December 2021, and for several months thereafter—during Mr. Bray's incarceration—Symetra repeatedly requested information from Mr. Bray showing that he remained benefits-eligible. *See* AR 596 (December 29, 2021); AR 631–32 (February 15, 2022); AR 234, 633–34 (March 31, 2022); AR 4527–32 (April 29, 2022); AR 4616–23 (June 8, 2022); AR 4652–55 (July 5, 2022); *see also* AR 740–47. Mr. Bray did not respond to these requests, and on July 16, 2022, Symetra suspended his benefits. AR 776–79. A little more than one month later, on August 24, 2022—still having not received any response from Mr. Bray—Symetra terminated Mr. Bray's benefits "for failure to provide proof of claim, as well as failure to be under the care of a treating provider." AR 803.

*Following his release, Mr. Bray was examined by Jarod Marcotte, a certified physician assistant, and Nicholas Aberle, M.D., an orthopedic surgeon. See* AR 2288, 2307. Mr. Bray met with Mr. Marcotte on March 21, 2023, to "establish care" for his left shoulder pain. AR 2288. Mr. Marcotte found that Mr. Bray had limited range of motion in his left shoulder as well as bony tenderness, AR 2289, but determined that Mr. Bray could return to work with restrictions, including that he lift no more than ten pounds. AR 867. Dr. Aberle examined Mr. Bray on July 20, 2023. AR 2305, 2307. He diagnosed Mr. Bray with chronic left shoulder pain, noting that he had constant pain and difficulty with movement. AR 2305. Dr. Aberle also determined that Mr. Bray could return to work with a ten-pound lifting restriction. AR 2307.

*On June 22, 2023, Mr. Bray, through counsel, appealed the termination of his benefits.* AR 851–58. Mr. Bray explained that his incarceration left him unable "to provide Symetra with updated documentation," and he was "not able to schedule any appointments since early 2020." AR 853. To support his appeal, Mr. Bray submitted a small number of medical records regarding his in-custody care and records of his visits with Mr. Marcotte and Dr. Aberle. AR 851, 2286, 2310.

*In adjudicating Mr. Bray's appeal, Symetra obtained two independent medical reviews and an employability analysis.* The first medical record review was completed by Arjun Saxena, M.D., an orthopedic surgeon. AR 6282–6326. The second was completed by Jaime Foland, M.D., a physical medicine and rehabilitation specialist. AR 6327–6366. After reviewing Mr. Bray's medical records in detail, Dr. Saxena and Dr. Foland reached the same conclusion—that beginning July 17, 2022, Mr. Bray was able to occasionally lift as much as twenty pounds. AR 6324, 6364. Dr. Saxena and Dr. Foland identified other restrictions in their reports, including restrictions on climbing, crawling, and overhead reaching. *See* AR 867, 2307, 6324, 6364. A Symetra vocational rehabilitation consultant, Jarrod Perry, then conducted an employability analysis. AR 6379–81. The analysis incorporated Dr. Saxena and Dr. Foland's restrictions and the Plan's gainful-wage threshold. AR 6379. In his report, Mr. Perry noted that, for Mr. Bray, the Plan's "disability" definition would change on March 17, 2023, from one requiring Mr. Bray to be disabled from his "regular occupation" to one requiring Mr. Bray to be disabled from any "gainful occupation." AR 6379; *see also* AR 3449 (noting the "disability" definition

16

change).  The analysis did not find that Mr. Bray could perform his own box-stacker occupation; it identified one other occupation he could perform.  AR 6379–81.

*Symetra upheld its initial decision to terminate Mr. Bray's benefits effective July 16, 2022.*  AR 148–55.  Symetra explained that, based on Dr. Foland and Dr. Saxena's reports and Mr. Perry's employability analysis, it concluded that "the totality of the information is not supportive of restrictions and limitations which would preclude [Mr. Bray] from performing the material and substantial duties of any gainful occupation," and therefore, Mr. Bray "does not continue to meet the Policy definition of Disabled."  AR 154.

*Mr. Bray filed this case in January 2024.*  Compl. [ECF No. 1].  The Complaint asserts a single claim for benefits under ERISA's civil enforcement provision, 29 U.S.C. § 1132(a)(1)(B).  *Id.* ¶ 2 ("WHEREFORE" clause).  For relief, Mr. Bray seeks benefits due "through the date of judgment," any "benefits beyond disability benefits that Plaintiff is entitled to while receiving disability benefits, including but not limited to reinstatement of Plaintiff's life insurance coverage and a waiver of premiums," "[r]eimbursement of all expenses and premiums Plaintiff paid for benefits under the Plan from the time of termination of benefits to the present," "[a] declaration that Plaintiff is entitled to ongoing benefits under the Plan so long as Plaintiff remains disabled under the terms of the Plan," attorneys' fees and costs, and interest.  *Id.* ¶¶ 2, 4–7 (following the "WHEREFORE" clause).

II

A

Suits brought under § 1132(a)(1)(B) to recover benefits allegedly due to a participant are reviewed *de novo* unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the policy grants the administrator such discretion, then "review of the administrator's decision is for an abuse of discretion." *Johnston v. Prudential Ins. Co. of Am.*, 916 F.3d 712, 714 (8th Cir. 2019) (quoting *McClelland v. Life Ins. Co. of N. Am.*, 679 F.3d 755, 759 (8th Cir. 2012)). Here, there is no question the Policy vests Symetra with discretion to determine benefits-eligibility questions. *See* AR 3434, 3471 ("We have the discretionary authority to determine your eligibility for benefits and to construe the terms of the policy to make a benefits determination."). Ordinarily, the presence of this discretion-granting language is enough to warrant abuse-of-discretion review.

Mr. Bray argues, however, that his claim should be reviewed *de novo*. To support this argument, Mr. Bray relies on Minn. Stat. § 60A.42. ECF No. 14 at 8–11. The statute says:

> No policy, contract, certificate, or agreement offered or issued in this state providing for disability income protection coverage may contain a provision purporting to reserve discretion to the insurer to interpret the terms of the contract or provide a standard of review that is inconsistent with the laws of this state, or less favorable to the enrollee when a claim is denied than a preponderance of the evidence standard.

Minn. Stat. § 60A.42. Section 60A.42 took effect January 1, 2016, and "applies to policies issued or renewed on or after that date." 2015 Minn. Sess. Law Serv., ch. 59, § 1 (S.F. 997); *see Kaminski v. UNUM Life Ins. Co. of Am.*, 517 F. Supp. 3d 825, 853 (D. Minn. 2021). Here, Symetra issued the policy to WP Holding on January 1, 2014. AR 3434. Symetra amended the policy effective January 1, 2016. AR 3431. The question, then, is whether the amendment is an "issuance" or a "renewal" for § 60A.42's purposes.

Mr. Bray and Symetra agree that, to answer this question, I should approach the issue as Judge Nelson did in *Kaminski*. There, Judge Nelson found that a policy with an original effective date of January 1, 2013, was "renewed" on May 1, 2016. 517 F. Supp. 3d at 852–58. Applying Minnesota contract law, *Kaminski* held that the phrase "issued or renewed" does not include "amendments" to a policy. *See id.* at 856–57. After surveying cases addressing similar statutes in states other than Minnesota, Judge Nelson determined that the dispositive question to determine whether a policy revision is an "issuance or renewal" versus an "amendment" is whether the revision "replaced" the original policy versus whether the revision made "discrete changes" to the policy. *Id.* at 857. The revision at issue in *Kaminski*, though labeled an "amendment," by its terms "'*replaced*' '*the entire policy*,'" meaning the revision resulted in a renewal of the policy. *Id.* at 855, 857–58 (emphasis in original).

Accepting the parties' agreement that *Kaminski* provides the correct analysis, this case is different. The revision at issue here, titled "Amendment No. 1," resulted in a discrete change to the Symetra policy. It modified the eligibility (or "elimination") period applicable to one class of participants, resulting in changes to eligibility-period provisions

19

appearing on three pages of the nearly fifty-page policy.  AR 3431; *see* AR 3432–79.  A specific revision to a specific term affecting a few pages of a much larger policy fits *Kaminski*'s notion of "discrete."

Mr. Bray argues Amendment No. 1 did not make "discrete" changes to the Symetra policy.  ECF No. 28 at 3.  Relying on a dictionary definition of "discrete" as "consisting of distinct or unconnected elements," Mr. Bray argues that Amendment No. 1 "clearly affects a connected part of the policy, as it modified the language of a critical element on the first few pages of the policy."  *Id.*  This is not persuasive.  Mr. Bray cites no case adopting his argument.  And the idea that a revision is a "renewal" if it affects a policy provision that is "connected" to other policy provisions seems illogical and practically boundless.  Insurance policies consist of interconnected terms.  If a revision's "connections" to other policy provisions were enough, then is difficult to understand how any policy revision would not be a renewal of the policy.  It might be different if we were talking about trivial revisions—for example, revisions that corrected misspellings, modified captions, or repaginated a document.  But *Kaminski* and the cases it cited did not draw the line at trivial.  Accepting Mr. Bray's argument would, for all practical purposes, eviscerate the renewal-versus-amendment distinction central to *Kaminski* and that the parties agree governs the question here.  The better answer is that the Symetra policy was not "issued or renewed" in the relevant sense on or after January 1, 2016.  Symetra's decision to terminate Mr. Bray's long-term disability benefits will be reviewed for abuse of discretion.

B

The Eighth Circuit applies two distinct tests to determine whether an ERISA plan administrator's benefits determination was reasonable and not an abuse of discretion. First, to determine whether an administrator's interpretation of plan terms was reasonable, the court applies the five-factor test from *Finley v. Special Agents Mutual Benefit Ass'n*, 957 F.2d 617, 621 (8th Cir. 1992). *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (en banc); *see also id.* at 1014 (Gruender, J., dissenting). The five factors to be considered ask whether the administrator's interpretation: (1) is consistent with the goals of the plan; (2) renders any language of the plan meaningless or internally inconsistent; (3) conflicts with ERISA; (4) is consistent with the administrator's prior determinations regarding the terms at issue; and (5) is contrary to the clear language of the plan. *Peterson ex rel. E v. UnitedHealth Grp. Inc.*, 913 F.3d 769, 775–76 (8th Cir. 2019). "While these non-exhaustive factors 'inform our analysis,' the ultimate question remains whether the plan interpretation is reasonable." *Id.* at 776 (quoting *King*, 414 F.3d at 999).

Second, to determine whether an administrator reasonably applied its interpretation to the facts of a particular case, the test is whether the decision is "supported by substantial evidence." *Johnston*, 916 F.3d at 714 (quoting *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1050 (8th Cir. 2011)). "Substantial evidence is more than a scintilla but less than a preponderance." *Id.* (quoting *Green*, 646 F.3d at 1050); *see also Jones v. Aetna Life Ins. Co.*, 856 F.3d 541, 547–48 (8th Cir. 2017) (citations omitted) (same).

Other considerations are relevant to both tests. "If an administrator also funds the benefits it administers . . . the district court 'should consider that conflict as a factor' in

21

determining whether the administrator abused its discretion." *Jones*, 856 F.3d at 548 (quoting *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 718 (8th Cir. 2014)). "A decision supported by a reasonable explanation . . . should not be disturbed, even though a different reasonable interpretation could have been made." *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 833 (8th Cir. 2014) (alteration in original) (citation and internal quotation marks omitted), *as corrected* (July 15, 2014); *see also Prezioso v. Prudential Ins. Co. of Am.*, 748 F.3d 797, 805 (8th Cir. 2014) ("We must affirm if a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." (citation and internal quotation marks omitted)). "[A] reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales." *Waldoch*, 757 F.3d at 829–30 (citation and internal quotation marks omitted). "Courts reviewing a plan administrator's decision to deny benefits will review only the final claims decision, and not the 'initial, often succinct denial letters,' in order to ensure the development of a complete record." *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 952 (8th Cir. 2010) (first citing *Galman v. Prudential Ins. Co. of Am.*, 254 F.3d 768, 770–71 (8th Cir. 2001); and then citing *Wert v. Liberty Life Assurance Co. of Bos.*, 447 F.3d 1060, 1066 (8th Cir. 2006)).

C

1

Symetra applied an incorrect plan term when it upheld its decision to terminate Mr. Bray's long-term disability benefits. Recall that Mr. Bray's "regular occupation" period—

*i.e.*, the period during which Mr. Bray had to show that he was prevented from performing the "material and substantial duties of [his] regular occupation—ran from March 17, 2018, to March 16, 2023. AR 339, 800, 803, 3449. Symetra's termination of Mr. Bray's benefits was effective July 16, 2022, eight months before the "regular occupation" period expired. AR 776, 3449. Effective March 17, 2023, Mr. Bray had to show, not only that he was disabled from his own occupation, but also from "any gainful occupation," which the Plan defined as "any occupation that your past training, education, or experience would allow you to perform or for which you can be trained." AR 3449, 3450. In its final decision terminating Mr. Bray's benefits effective July 16, 2022, Symetra applied the wrong "any gainful occupation" standard. Symetra asked its medical-record reviewers to opine regarding Mr. Bray's restrictions and limitations beginning on July 17, 2022, or during the "regular occupation" period. *See* AR 6323, 6363. Based on the reviewers' opinions, Symetra explained: "[T]he totality of the information is not supportive of restrictions and limitations which would preclude [Mr. Bray] from performing the material and substantial duties of *any gainful occupation*." AR 154 (emphasis added). Symetra's final decision nowhere addressed whether Mr. Bray remained disabled from his "regular occupation." Symetra does not dwell on this mistake, but Symetra also does not dispute it applied the wrong test to evaluate Mr. Bray's claim during the "regular occupation" period's remaining eight months. *See generally* ECF Nos. 21, 26, 27.

At least ordinarily, the law favors finding an abuse of discretion when an ERISA plan administrator reaches an adverse benefits determination based on an inapplicable plan document or term. *See, e.g.*, *Huss v. IBM Med. & Dental Plan*, 418 F. App'x 498, 504 (7th

Cir. 2011).  Applying the wrong term of a plan would run counter to the Eighth Circuit's *Finley* factors.  It is difficult to think of something more "contrary to the clear language of the plan" and ERISA than adjudicating a claim under inapplicable terms of an ERISA plan (and not adjudicating a claim under applicable terms) and applying an incorrect term at least would pose a risk of inconsistency with the goals of the plan.  *See Peterson*, 913 F.3d at 775–76.

There is no reason to reach a different decision here.  The physicians Symetra retained to review Mr. Bray's medical records, Dr. Foland and Dr. Saxena, both opined that as of July 17, 2022, Mr. Bray's physical condition limited him to performing light-duty work.  AR 6323, 6364; *see* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time frequent lifting or carrying of objects weighing up to 10 pounds.").  Based on these opinions, Symetra analyzed Mr. Bray's employability and identified a light-duty occupation for which Mr. Bray would be qualified.  AR 53–55.  But in his "regular occupation," Mr. Bray was required to repetitively lift more than fifty pounds and as much as seventy-five pounds, activities exceeding light-duty work.  AR 3364, 6105; 20 C.F.R. § 404.1567(d) ("Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.").  In other words, had Symetra adhered to Dr. Foland and Dr. Saxena's opinions and applied the correct "regular occupation" standard to Mr. Bray's claim during the "regular occupation" period's remaining eight months, it would have reversed course and awarded benefits during that period.

To defend its final decision, Symetra argues (1) that Mr. Bray "failed to provide proof of ongoing disability" as required by the Plan, (2) that he failed to show he was "under the regular care of a physician" during his incarceration, and (3) that Mr. Bray was under a non-covered legal disability during his confinement.  ECF No. 26 at 4–9.  These arguments are not convincing.  Under the abuse of discretion standard, a reviewing court may not "consider *post hoc* rationales" that are offered "during litigation to justify a decision reached on different grounds during the administrative process."  *King*, 414 F.3d at 999, 1003; *see also Waldoch*, 757 F.3d at 829–30; *Carr v. Anheuser-Busch Cos.*, 495 F. App'x 757, 764–65 (8th Cir. 2012).  Symetra identified none of these issues in its appeal decision as grounds for upholding the termination of Mr. Bray's benefits.  *See* AR 148–55.  It would be inappropriate to consider them now.

If they could be considered, it is difficult to understand how any of these arguments might justify upholding Symetra's decision.  (1) After Mr. Bray's counsel inquired about providing evidence supporting his claim, Symetra invited counsel to submit this information, *see* AR 808–09, 833, and counsel submitted additional information with Mr. Bray's administrative appeal, *see* AR 154.  With this information's submission, it is difficult to understand how Mr. Bray's claim might reasonably have been denied for a failure to provide proof.  (2) The administrative record includes fifteen pages of medical records showing treatment Mr. Bray received during the roughly twenty months he was incarcerated.  *See* AR 4744–58.  Though Mr. Bray reported his shoulder condition to jail medical staff, AR 4744, 4757, the records do not show that he received care specifically for his shoulder, *see* AR 4744–58.  But the records also do not show what care might have

been available for Mr. Bray's shoulder, what care he might have needed, or that Mr. Bray declined available care or treatment.  Without a more substantial record that fills these gaps, it would seem unreasonable to count the absence of shoulder-specific care during his incarceration against Mr. Bray.  (3) To support its argument that Mr. Bray was under a legal disability during his incarceration, Symetra cites *Cich v. National Life Insurance Co.*, No. 11-cv-742 (DWF/JJG), 2012 WL 12848429, at *6–9 (D. Minn. Aug. 21, 2012), *aff'd*, 748 F.3d 807 (8th Cir. 2014).  *Cich* is materially different from this case.  There, Judge Frank concluded that the plaintiff was "unable to establish that his allegedly disabling condition rendered him unable to work."  *Id.* at *7.  The record instead showed that the plaintiff's "inability to practice chiropractic . . . was caused by his license suspension."  *Id.* Here, by contrast, Symetra determined that Mr. Bray was disabled by his physical condition and paid him benefits for over three years before he was incarcerated.  Symetra identifies no Plan language that might preclude Mr. Bray from receiving benefits in this situation.  It cites no case holding that a legal disability trumps a preexisting factual disability and justifies the termination of benefits under an ERISA plan.  And cases addressing this question generally ask whether the factual disability preceded the legal disability and, if the answer is "yes," seem most of the time to hold that the insured is entitled to benefits. *See, e.g.*, *BLH ex rel. GEH v. Nw. Mut. Life Ins. Co.*, 92 F. Supp. 2d 910, 915–18 (D. Minn. 2000) (Alsop, J.); *Pogue v. Nw. Mut. Life Ins. Co.*, No. 18-5291, 2019 WL 1376032, at *2–3 (6th Cir. 2019); *Harman v. Standard Ins. Co.*, 564 F. Supp. 3d 1187, 1194–96 (M.D. Fla. 2021).

At the hearing on the parties' motions, Symetra acknowledged that, if its decision to uphold the termination of Mr. Bray's benefits for the "regular occupation" period's remaining seven months was found to be an abuse of discretion, then the better remedy is to order the payment of Mr. Bray's benefits during this period (and not to remand the claim to Symetra for a decision on the correct "regular occupation" standard). This approach makes sense. With respect to this period, Mr. Bray's motion will be granted.

2

The remaining questions concern Mr. Bray's claim for benefits after the "regular occupation" to "any gainful occupation" test change on March 17, 2023. Mr. Bray argues this aspect of his claim should be remanded to Symetra for a "more thorough and just" review. ECF No. 14 at 26. Mr. Bray claims he was unaware Symetra would conduct a gainful-occupation review and says he "would have supported his appeal much differently had he known he would need to address an Any Occupation review." ECF No. 28 at 11. Mr. Bray does not seek a benefits award during this period as part of his motion. Symetra argues that its decision to deny Mr. Bray's claim for benefits during this period—*i.e.*, its determination that Mr. Bray could perform a "gainful occupation"—was reasonable and that summary judgment should be entered in its favor on this aspect of Mr. Bray's claim. ECF No. 27 at 7–8.

Mr. Bray's arguments for remand are not persuasive. (1) Mr. Bray knew (or should have known) Symetra would adjudicate his claim for benefits during the "any gainful occupation" period because Symetra told him it would do just that. In its original denial letter dated August 24, 2022, Symetra reminded Mr. Bray of the upcoming test change as

part of a request for information: "On March 17, 2023, the definition of disability as defined above will be changing.  This information is needed because we need to continue to verify restrictions and limitations and to aide in your ongoing eligibility as well as to aide in you upcoming eligibility review of benefits *beyond March 17, 2023*."  AR 803 (emphasis added).  And before Symetra issued its final decision on Mr. Bray's administrative appeal, it disclosed Dr. Foland and Dr. Saxena's independent medical reviews in which they were asked to assess Mr. Bray's restrictions limitations from "7/17/2022 *through present*."  AR 37–38, 97 (emphasis added); AR 6377.[22]  (2) Mr. Bray passed on the chance to submit additional appeal-supporting information in response to Symetra's disclosure of Dr. Foland's and Dr. Saxena's opinions.  Though Mr. Bray's counsel described the reviews as "unsupported by the existing medical evidence" and biased, he also wrote: "At this point, neither myself nor my client's doctors can continue to respond to the nonsense back and forth the insurance company continues to pursue with their mercenary medical opinions. We would request that the insurer simply make a decision on the file."  AR 147.  In other words, Mr. Bray chose not to take advantage of the chance to support his claim for benefits under the "any gainful occupation" test with additional evidence when he had the chance. It is difficult to understand why he should be given a second chance now.  (3) Mr. Bray does not explain how he would have supported his appeal any differently had he known Symetra was conducting a "gainful occupation" review, and he does not describe or

---

[22]     Symetra's disclosure of Dr. Foland's and Dr. Saxena's reviews and opinions was required by regulations governing ERISA disability-benefits claim procedures.  *See* 29 C.F.R. § 2560.503-1(h)(4)(i).

identify what evidence he would submit to support his claim if it were remanded now. Against these considerations, the better approach is not to remand Mr. Bray's claim for benefits during the "any gainful occupation" period, but to review Symetra's final decision on this question.

On that question, Symetra's decision wasn't just reasonable; it was the better decision considering the evidence in the administrative record. In other words, even *de novo* review of this aspect of Mr. Bray's claim favors Symetra.[23] Symetra based its final decision largely on Dr. Foland's and Dr. Saxena's peer reviews, and its reliance on these reviews was reasonable. Dr. Foland and Dr. Saxena specialize in medical fields relevant to Mr. Bray's injury. Dr. Foland specializes in physical medicine and rehabilitation and pain medicine. AR 6366. Dr. Saxena is an orthopedic surgeon. AR 6325. In a report of his review, Dr. Foland described Mr. Bray's medical history across roughly thirty-five pages. AR 6327–6361. Dr. Foland tethered his restrictions on Mr. Bray's physical activities to specific aspects of Mr. Bray's medical history. AR 6364. For example, he cited prior reports that found Mr. Bray could return to work, albeit with a ten-pound lifting

---

[23]    Under *de novo* review, a district court must make an independent decision regarding benefits, affording no deference to the administrator's decision. *Firestone Tire & Rubber Co.*, 489 U.S. at 112; *accord Kaminski*, 517 F. Supp. 3d at 858. A district court must determine "whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review." *Kaminski*, 517 F. Supp. 3d at 858 (citations and internal quotations omitted). The claimant bears the burden of showing he is disabled and entitled to benefits under the plan. *Farley v. Benefit Tr. Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992). And when, as here, a ruling under Rules 39(b) and 52(a)(1) is requested, a district court acts as a factfinder, resolving fact disputes, making credibility determinations, and weighing the evidence. *See Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1026 (8th Cir. 2021); *Chapman v. Unum Life Ins. Co. of Am.*, 555 F. Supp. 3d 713, 716 (D. Minn. 2021).

restriction. AR 6364. And Dr. Foland's review was not one-sided. He explained that his assessment of Mr. Bray's condition was "guarded" considering Mr. Bray's extensive medical history, and he acknowledged that Mr. Bray's condition might deteriorate, warranting a reassessment. AR 6365.[24] In his report, Dr. Saxena described Mr. Bray's medical history across roughly thirty-nine pages, AR 6282–6320, summarized those part of Mr. Bray's medical history that were more important to his claim, AR 6321–23, and connected his restrictions to specific records, AR 6323. These reviews are reasonably thorough, not "incomplete" or "selective," *Willcox v. Liberty Life Assurance Co. of Bos.*, 552 F.3d 693, 701 (8th Cir. 2009), and they are consistent with the core conclusions of Mr. Bray's treating physicians and other physicians who have examined Mr. Bray, *see id.* (quoting *Norris v. Citibank, N.A. Disability Plan (501)*, 308 F.3d 880, 885 (8th Cir. 2002)).

The predominant opinion appearing in the administrative record is that Mr. Bray can work with restrictions, and Dr. Foland's and Dr. Saxena's opinions are consistent with this predominant opinion. That opinion was often (if intermittently) expressed by Mr. Bray's treating doctors. *See supra* at 12–13. It was the opinion reached by Dr. Vorlicky, AR 3641, Dr. Aberle, AR 2307, and certified physician assistant Marcotte, AR 867. It is true that physicians more commonly prescribed a ten-pound lifting restriction, not the twenty-pound "material handling" restriction identified by Dr. Foland and Dr. Saxena. AR

---

[24]      One aspect of Dr. Foland's report is not convincing. Dr. Foland explained that his restrictions were justified because, among other things, Mr. Bray "was able to drive short distances and attend church without any noted issues." AR 6364. A relationship between these facts and the specific restrictions Dr. Foland identified is not clear. Regardless, Dr. Foland draws sufficient support for his restrictions from other documents in the extensive record.

6365, 6323. But Dr. Foland and Dr. Saxena made clear that, in their opinions, Mr. Bray was only capable of "occasionally" lifting as much as twenty pounds, meaning the gap between the medical professionals' opinions is not wide. *See* AR 6365, 6323. Mr. Bray has not addressed this issue. He has not explained why the comparatively small difference between Dr. Foland's and Dr. Saxena's opinions and the opinions of other medical professionals who examined Mr. Bray might show that Dr. Foland and Dr. Saxena were wrong or that Symetra should not have relied on them.

It was reasonable for Symetra to rely on the employability analysis. The analysis correctly accounted for Dr. Foland's and Dr. Saxena's recommended restrictions, Mr. Bray's educational background and work history, and prior occupational and vocational reports in the record. AR 6374–76. And the analysis utilized current occupational data to identify one light-duty occupation matching Mr. Bray's medical and vocational profiles. AR 6376. Importantly, Mr. Bray does not argue that Symetra's reliance on the employability analysis was unjustified or flawed for any reason.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Plaintiff Vincent Bray's Motion for Judgment on the Administrative Record [ECF No. 13] is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** to the extent it seeks an award of long-term disability benefits from the date

of termination through the end of the Plan's "regular occupation" period on March 16, 2023. Mr. Bray's Motion is in all other respects **DENIED**.

      2.     Defendant Symetra Life Insurance Company's Motion for Summary Judgment [ECF No. 19] is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** to the extent it seeks a judgment in Symetra's favor regarding Plaintiff's claim for long-term disability benefits during the Plan's "any gainful occupation" period beginning March 17, 2023. Symetra's Motion is in all other respects **DENIED**.

      3.     Symetra shall pay Mr. Bray's benefits due from the date of termination through March 16, 2023. The parties shall meet and confer regarding the amount of benefits due, the amount of prejudgment and post-judgment interest, claims for attorneys' fees and costs, and any other issues that would require court adjudication absent the parties' agreement. If the parties agree on these amounts, they shall submit a joint proposed order for judgment. If the parties do not agree on one or more of these amounts, they shall contact the Court to establish a briefing schedule and hearing date.


Dated:  May 27, 2025                    s/ Eric C. Tostrud
                                     Eric C. Tostrud
                                     United States District Court